Exhibit 3



# Intellectual
# Property Rights
# Seizure Statistics



**U.S. Customs and
Border Protection**

Fiscal Year
2021



# Contents

Executive Summary ........................................................................................................................5

IPR Seizure Totals .......................................................................................................................5

Counterfeit Commodity Spotlight – Cell Phones and Accessories ...............................................6-7

COVID-19 Spotlight .....................................................................................................................9

Operational and Enforcement Highlights ......................................................................................11

CBP Partnerships ..................................................................................................................12-15

Help CBP Protect American Ingenuity ..........................................................................................17

Exclusion Orders and Outreach ....................................................................................................19

Outreach: CBP/U.S. Chamber of Commerce Memorandum of Understanding .............................20

Outreach: The Year of the Small and Medium Sized Enterprises Webinar Series............................21

IPR and E-Commerce ............................................................................................................23-24

Centers of Excellence and Expertise Spotlight...............................................................................25

Mode of Transportation and Top Product Commodities ................................................................27

Seizure World Map ...............................................................................................................28-29

Number of Seizures ..............................................................................................................30-31

Products Seized by MSRP .....................................................................................................32-33

Total Seizure Lines and MSRP Seized by Economy ................................................................34-35

Seizures by Mode of Transportation ......................................................................................36-37

Health, Safety, and Security by Product .................................................................................38-39

MSRP by Centers of Excellence and Expertise .......................................................................40-41

CBP IPR Points of Contact ....................................................................................................42-43

Disclaimer: The information contained in this report does not constitute the official trade statistics of the United States. The statistics, and the projections based upon those statistics, are not intended to be used for economic analysis, and are provided for the purpose of establishing U.S. Department of Homeland Security workload.





Case: 1:24-cv-01749 Document #: 1-2 Filed: 03/01/24 Page 6 of 45 PageID #:28

# Executive Summary

U.S. Customs and Border Protection focuses its trade enforcement efforts on seven Priority Trade Issues (PTI). PTIs represent high-risk areas that can cause significant revenue loss, harm the U.S. economy, or threaten the health and safety of the American people. Current PTIs include **Intellectual Property Rights (IPR)**, which protect American Intellectual Property by interdicting violative goods and leveraging enhanced enforcement authorities.

Trade in illegitimate goods is associated with smuggling and other criminal activities, and often funds criminal enterprises. CBP protects the intellectual property rights of American businesses, safeguarding them from unfair competition and

use for malicious intent while upholding American innovation and ingenuity. CBP works with many partner government agencies and the trade community to mitigate the risks posed by imports of such illicit goods.

FY 2021 was another successful year for IPR enforcement. CBP made over 27,000 seizures (i.e., 102,490 seizure lines) with an estimated manufacturer's suggested retail price (MSRP) of over $3.3 billion, which represents an increase of 152% over the previous Fiscal Year, when goods valued at $1.3 billion MSRP were seized for IPR violations. CBP also received and responded to **711** inquiries from the field concerning IPR enforcement in **FY 2021**.



# Counterfeit Commodity Spotlight – Cell Phones and Accessories

Almost all of Americans now own a cell phone of some kind[1]. The percentage of Americans that own a smartphone is now 85%, up from just 35% in Pew Research Center's survey of smartphone ownership first conducted in 2011[2]. Production of goods such as smartphones, smartphone batteries, and chargers, is knowledge intensive and the industry relies heavily on technologies that are IPR-protected. Thus, the growing prevalence of such items not only intensifies IP dependence, but also makes it a lucrative target





for counterfeiters. The Organisation for Economic Co-operation and Development's report in 2017 found that nearly one in five mobile phones shipped internationally is fake[3]. Mobile phones, their accessories and components are among the top categories of fake goods seized by customs authorities and sold in great numbers during sales events such as Black Friday and Cyber Monday[4]. In addition, such counterfeits have been recently exploiting the global supply shortage in semiconductor chips. It is worth noting that the global shortage of semiconductor chips is linked to the high demand for digital services and manufacturing problems emerged during the COVID-19 pandemic[5]. Counterfeiters can exploit this demand and shortage in supply by using counterfeit semiconductors such as diodes in the market. As semiconductors are integral in many areas, e.g., healthcare, transport, and defense, the risk of private electronics such as mobile phones and accessories being affected is also high[6].

In FY 2021, CBP seized over **1,895** shipments of counterfeit cell phones and accessories. The seized merchandise is estimated to have a Manufacturer's Suggested Retail Price of over **$64 million**. A closer look at CBP statistics shows that most of the counterfeits originated from Hong Kong and China.

Further, the number of seizures occurred in the express consignment and cargo environment combined accounted for more than 90 percent of the total IPR seizures of cell phones and accessories for FY 2021.

In addition to the negative economic impacts that such counterfeit mobile phones and accessories pose to the public, there are also notable non-economic impacts that negatively impact society. First, counterfeit mobile phones pose significant health and safety risks. Such devices may contain levels of chemicals such as lead and cadmium that often exceed established safety standards. In some cases, the values were 35-40 times higher than the globally accepted limits for lead[7]. CBP, citing an investigation conducted by the Government Accountability Office, previously reported a 99 percent failure rate in 400 counterfeit adapters tested for safety,

1   Pew Research Center, "Mobile Fact Sheet," https://www.pewresearch.org/internet/fact-sheet/mobile/, April 7, 2021.
2   *Id.*
3   "One in five mobile phones shipped abroad is fake," Organization for Economic Co-operation and Development, March 28, 2017, *One in five mobile phones shipped abroad is fake - OECD* and accompanying Report (OECD 2017 Report).
4   "Counterfeit and pirated goods get boost from pandemic, new report confirms," European Union Agency for Law Enforcement and Cooperation (Europol), March 7, 2022, https://www.europol.europa.eu/media-press/newsroom/news/counterfeit-and-pirated-goods-get-boost-pandemic-new-report-confirms and accompanying report (EUROPOL 2022 IPR Threat Report).

# Counterfeit Commodity Spotlight – Cell Phones and Accessories

fire, and shock hazards, and found that 12 of such adapters posed a risk of lethal electrocution to the user[8]. In addition, counterfeit electronic devices may also include malware and other harmful software, adding the risk of data theft[9].

To avert such dangers, consumers should purchase from reputable sources and professional resellers should be aware that counterfeit parts may be part of the supply chain.

## FY 2021 IPR Seizures – Cell Phones and Accessories

| Source Country | Seizure Lines | % of Total |
|---|---|---|
| Hong Kong | 1,118 | 59.0% |
| China | 606 | 32.0% |
| South Africa | 33 | 1.7% |
| Malaysia | 18 | 0.9% |
| United States | 17 | 0.9% |
| All Other Countries | 103 | 5.4% |
| **Grand Total** | **1,895** | **100.0%** |

## FY 2021 MSRP of IPR Seizures – Cell Phones and Accessories

| Source Country | MSRP | % of Total |
|---|---|---|
| China | $ 39,183,693 | 60.7% |
| Hong Kong | $ 22,105,010 | 34.2% |
| Malaysia | $ 2,005,387 | 3.1% |
| United Arab Emirates | $ 432,091 | 0.7% |
| Vietnam | $ 236,485 | 0.4% |
| All Other Countries | $ 623,225 | 1.0% |
| **Grand Total** | **$64,585,891** | **100.0%** |




5   See EUROPOL 2022 IPR Threat Report at 12.
6   *Id.*
7   "International Telecommunication Union's ITU-T Technical Report," International Telecommunication Union, December 11, 2015, *https://www.itu.int/dms_pub/itu-t/opb/tut/T-TUT-CCICT-2015-PDF-E.pdf*, at 10.
8   "Combatting Trafficking in Counterfeit and Pirated Goods," CBP, January 24, 2020, *https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf*, at 10.
9   See EUROPOL 2022 IPR Threat Report at 12.





# COVID-19 Spotlight

In FY 2021, CBP continued to target and seize illegal imports of counterfeit, unapproved, or otherwise substandard COVID-19 related products that threatened the health and safety of American consumers. These seizures included 38,154 Food and Drug Administration-prohibited COVID-19 test kits, just over 35 million counterfeit face masks and 8,677 Food and Drug Administration-prohibited hydroxychloroquine tablets. Fifty-three percent of the seizures occurred in the express consignment environment, 18 percent were discovered in incoming mail and roughly 31 percent originated in China. CBP also collaborated with partner government agencies to expedite medical supplies and personal protective equipment through the customs clearance process, while working to identify and intercept fraudulent, unapproved, or otherwise substandard material

| FY 2021 Overall COVID- 19 Related Seizure Totals As of 10/1/2021 | | |
|---|---|---|
| **Product** | **Total Seizures** | **Quantity** |
| Covid-19 Test Kits | 53 | 38,154 |
| Antibody Test Kits | 9 | 1,063 |
| Masks | 670 | 35,092,178 |
| Chloroquine | 10 | 1,810 |
| Hydroxychloroquine | 59 | 8,677 |
| Azithromycin | 32 | 2,141 |
| Lianhua Qingwen | 17 | 17,567 |
| Respirator/Ventilator | 1 | 27 |
| Hand Sanitizers | 2 | 150,001 |
| Virus Shut-Out Lanyards | 1 | 30,000 |
| Vaccination Cards | 734 | 21,314 |

CBP's COVID-19 Cargo Resolution Team (CCRT), is comprised of a network of subject matter experts from across the agency. The CCRT triaged incoming requests from importers and customers; coordinated with federal, state, and local government agencies; facilitated inbound shipments through ports of entry; expedited importation of critical medical supplies; and responded directly to inquiries about the importation of personal protective equipment, COVID-19 test kits, ventilators, and other medical supplies.



In FY 2021, the CCRT was responsible for expediting shipments of the COVID-19 vaccine and related vaccine materials. The CCRT worked closely with several importers and other government agencies to ensure the vaccine and vaccine materials were released with minimal delay. During the FY 2021, the CCRT also responded to 939 questions from the trade community and facilitated the clearance of 788 Operation Warp Speed (OWS) shipments.

To read more about CBP's efforts during the pandemic, please visit *https://www.cbp.gov/newsroom/coronavirus*



# Operational and Enforcement Highlights

Components of CBP's Integrated Trade Targeting Network conducted 4 national level IPR Trade Special Operations and 76 local IPR Trade Special Operations in FY 2021.  These operations targeted high-risk shipments at seaports, airports, rail facilities, international mail facilities and express carrier hubs across the United States.  The IPR Trade Special Operation is an important tactic used by CBP to gather intelligence on how counterfeiters are shipping product to the U.S.  The operations also disrupt these nefarious supply chains and lead to criminal investigations by Homeland Security Investigations.





In FY 2021, IPR Trade Special Operations resulted in seizures worth an estimated $21 million dollars in MSRP.  Importantly, Trade Special Operations often result in seizures of products that may be both counterfeits and violations of other import safety laws.  Examples are prohibited food products and unapproved pharmaceuticals.

**IPR Enforcement Training**
Part of the Office of Trade's responsibilities include training CBP field personnel in identifying suspect imports, making infringement determinations, and following proper IP border enforcement procedures.  In FY 2021, despite the travel restrictions caused by the COVID-19 pandemic, the Office of Trade conducted more advanced IP enforcement training sessions than in FY 2020, reaching 8 out of the 10 Centers of Excellence and Expertise, including the Pharmaceutical, Health and Chemical CEE, to which Regulations and Rulings provided instruction on IP enforcement relating to COVID-19 specific products, and to CBP officers (CBPO)s stationed at the ports of entry with the highest volume of trade. The training continues to raise the profile of IPR issues: from FY 2019 to FY 2020 the number of requests from CBP Officers and Importer Specialists for pre-seizure IPR enforcement advice



from attorney-advisors in the Regulations and Rulings Directorate increased by 20% compared to FY 2019.  In FY 2021 the number of pre-seizure requests rose even more steeply, increasing 57% from FY 2020, totaling over 700 requests.

# CBP Partnerships

CBP works with partner government agencies to facilitate legitimate trade that supports economic growth and shields the American public and businesses from unsafe products, intellectual property theft, and unfair trade practices.

**Immigration and Customs Enforcement (ICE) – Homeland Security Investigations (HSI)**

CBP and ICE-HSI identify cases in which third-party intermediaries have demonstrably directed, assisted financially, or aided and abetted the importation of counterfeit merchandise. In coordination with the Department of Justice, CBP and ICE-HSI seek all available statutory authorities to pursue civil fines and other penalties against these entities, including remedies under 19 U.S.C. § 1526(f), as appropriate.

CBP and ICE-HSI mitigate the welfare and financial risks posed by imports of illicit products. In FY 2021, ICE-HSI arrested 388 individuals, obtained 155 indictments, and received 100 convictions related to intellectual property crimes.

**Collaboration Spotlight:** In partnership with CBP, HSI launched *Operation Stolen Promise* (OSP) in April 2020 to protect the Homeland from the increasing and evolving threat posed by COVID-19- related fraud and criminal activity. As part of OSP, CBP Officers and HSI special agents have opened investigations nationwide, seized millions of dollars in illicit proceeds; made multiple arrests; and shut down thousands of fraudulent websites. Specifically, OSP during its year aimed to focus on three areas: combating the illegal import and sale of counterfeit and substandard products; detecting and deterring financial fraud scams; and preventing the exploitation of relief and stimulus programs.

One year after its inception in April 2020, OSP has yielded significant results, both statistically and in terms of the impact the initiative has on protecting the health and safety of the American public. This work has kept counterfeit and substandard goods out of the medical and consumer supply chains while ensuring violators are held accountable for their criminal efforts to exploit the pandemic for profit.

In total, this operation has yielded 3,131 COVID-19 related seizures that included prohibited COVID-19 Test Kits, Prohibited Pharmaceuticals, Counterfeit Masks and more. OSP has resulted in 362 Criminal Arrests,



**Annual Arrests, Indictments, and Convictions Related to Intellectual Property Rights Crimes**

| | FY17 | FY18 | FY19 | FY20 | FY21 |
|---|---|---|---|---|---|
| Individuals Arrested | 457 | 391 | 256 | 203 | 388 |
| Indictments Obtained | 288 | 286 | 197 | 125 | 155 |
| Convictions | 240 | 260 | 157 | 98 | 100 |

31 Convictions, and a total of $54.7 million USD of illicit proceeds seized. The operation has also led to 110 seizures of counterfeit vaccines, with 49 cases initiated and 15 criminal arrests made.

As the public demand for access to vaccines and treatments grow, so do illegal attempts to introduce counterfeit versions of these items into U.S. marketplace. As such, *Operation Stolen Promise 2.0* has been launched to expand the focus of OSP to address the emerging public health threat of counterfeit versions of COVID-19 vaccines and treatments entering the marketplace. OSP 2.0 will focus on tackling new and evolving public health threats posed by the sale and distribution of counterfeit and/or unauthorized vaccines and treatments.

HSI will continue to partner with CBP to seize mislabeled, fraudulent, unauthorized, and prohibited COVID-19 test kits, treatment kits, homeopathic remedies, and personal protective equipment (PPE).



# CBP Partnerships



# CBP Partnerships

**The United States Postal Service (USPS)**
USPS is responsible for presenting mail and providing electronic data (AED) to CBP for arriving international mail parcels. USPS and CBP have worked to target and identify 31 violations imported through international mail. Both agencies are implementing new strategies for leveraging the AED already available to identify offending merchandise.

Collaboration Spotlight: *Operation Mega Flex* is a CBP-led, interagency effort that was initiated in July 2019 to ensure compliance and assess illicit networks in the international mail environment through periodic enhanced inspections. CBP conducts Mega Flex operations in close coordination with ICE, the U.S. Postal Inspection Service, and the U.S. Food and Drug Administration (FDA) to detect, intercept, and seize illicit goods arriving in small parcels from China.

For example, most seizures out of Memphis were counterfeit drivers' licenses. These shipments originated from China and were shipped to various locations throughout the United States. CBP learned that many of the shipments were smuggled in the bottom of boxes containing tassels, clothing, and even bundles of synthetic hair[10]. Further, in just one day in October 2020, CBPOs in LAX International Mail Facility (IMF) intercepted 812 shipments containing counterfeit footwear, handbags, wearing apparel, prohibited plant and animal products, and other items that threaten the health and safety of American consumers and undermine the competitiveness of U.S. businesses[11]. Similarly, CBP's New York Field Office, home to two IMF's, John F. Kennedy International Airport (the largest IMF in the United States), and the Port of New York/Newark, and its partners also inspected more than 4,000 shipments and seized 127 shipments for IPR violations[12].

On average, CBP processes more than 420,000 parcels of mail from China each day. Throughout *Operation Mega Flex*, CBP found that more than 13 percent of targeted shipments contain counterfeit goods or contraband items.





10 See *https://www.cbp.gov/newsroom/local-media-release/cbp-memphis-seizes-nearly-200-shipments-through-operation-mega-flex*.
11 See *https://www.cbp.gov/newsroom/local-media-release/operation-mega-flex-stops-hundreds-illicit-made-china-shipments-lax*.
12 See *https://www.cbp.gov/newsroom/local-media-release/cbp-new-york-field-office-seizes-127-ipr-violations-during-operation*.

# CBP Partnerships

**The National Intellectual Property Rights Coordination Center (IPR Center)**
The IPR Center, in collaboration with CBP, stands at the forefront of the United States government's response to combatting global intellectual property (IP) theft and enforcement of its international trade laws.

**Collaboration Spotlight:** *Operation Team Player* is an ongoing annual operation that begins after every Super Bowl and continues through the next one, targeting international shipments of counterfeit sports merchandise into the United States. This operation is run by the IPR Center in collaboration with CBP, the National Football League, and other major sports leagues to prevent the illegal importation and distribution of counterfeit sports merchandise.

Super Bowl LV was played on February 7, 2021, at Raymond James Stadium in Tampa, Florida. CBP and ICE HSI announced the seizure of more than 267,511 counterfeit sports-related items, worth an estimated $97.8 million manufacturer's suggested retail price (MSRP), through a collaborative enforcement operation targeting international shipments of counterfeit merchandise into the United States. They seized items such as fake jerseys, hats, rings, t-shirts, jackets, tickets, souvenirs, and thousands of other sports related memorabilia prepared to be marked as legitimate and authentic items.

Due to COVID-19, much of the illegal activity moved online, which refocused partner government agency efforts more towards commercial websites engaged in the illegal sale and distribution of counterfeit goods.

**Commercial Customs Operations Advisory Committee (COAC)**
The private sector plays an instrumental role in the global economy and has a unique opportunity to lend their considerable expertise to CBP. By partnering with industry leaders, CBP links our processes with modern business practices, which results in enhanced compliance with trade laws, improves our facilitation and enforcement efforts, and assists the U.S. economy. CBP's engagement with its federal advisory committee, the COAC, is a key component in evaluating and adapting CBP policies and getting feedback about significant proposed changes.

CBP has been able to adopt and implement recommendations presented by the COAC IPRWG. As of January 2021, CBP began concurrently issuing the notice of seizure (NOS) and initiating publication of the notice of intent to forfeit on all seized shipments with a domestic value less than $2,500. Although publication is advanced, all interested parties are afforded the same opportunity to respond to the NOS as they had under previously existing procedures. Additionally, CBP announced that effective June 7, 2021, NOS will be emailed to rights holders via the email addresses provided to CBP through the IPR e-Recordation program. Delivery of seizure notices via email allows for instantaneous notification to the rights holder. Issuing electronic NOS has increased the speed at which the trade community received the necessary information and allowed for instantaneous sharing of the information with the rights holder. It has also benefited CBP as it reduced the cost of mailing such notices. This paperless approach aligns with CBP's continuous effort to improve resource efficiency. CBP looks forward to further engagement with the COAC.











# Help CBP Protect American Ingenuity

**Donations Acceptance Program**

Pursuant to Section 308(d) of the *Trade Facilitation and Trade Enforcement Act* of 2015, P.L. 114-125, CBP enacted regulations at 19 C.F.R. §133.61, setting forth policies and procedures for accepting donations from private sector parties of hardware, software, equipment, and technologies for IPR enforcement purposes. These regulations are consistent with the CBP Commissioner's FY 2021 priority to identify, detect, and interdict high-risk shipments through partnerships.

Since 19 C.F.R. §133.61 went into effect in January 2018, DAP has fully executed five formal IPR enforcement partnerships with Procter & Gamble, Otter Products, Cisco Systems, Apple Inc., and Nike Inc. To date, 214 product authentication tools have been deployed to 70 locations. More importantly, these partnerships are demonstrably benefiting CBP's frontline and yielding a positive return on investment for its partners.

**Intellectual Property Rights e-Recordation**

CBP concentrates its IPR border enforcement on federally registered trademarks and copyrights that have been recorded with CBP by their owners using the Intellectual Property Rights e-Recordation (IPRR) system, *https://iprr.cbp.gov/*. All trademark and copyright recordations are contained in a secure proprietary database accessible by CBP personnel at all 328 ports of entry. Product ID manuals provided by rights holders are also linked to the database and used by CBP in making IPR border enforcement determinations. In FY21, CBP added over 2,000 recordations to their enforcement database. As of September 30, 2021, CBP was enforcing 20,758 active recorded copyrights and trademarks.

**Intellectual Property Rights e-Allegations**

Information on potential IPR infringements can be submitted to CBP using the e-Allegations Online Trade

Violation Reporting System at *https://eallegations.cbp.gov/s/* or by calling 1-800-BE-ALERT.

The e-Allegation program provides an electronic portal through which the trade community and the public can report suspected trade violations to CBP. The e-Allegation process enables CBP, in collaboration with the partners, to protect our economy from the effects of unfair trade practices and guard against the entry of products that could pose a threat to health and safety.

In addition to IPR violations, there are other types of trade violations, such as forced labor violations, duty evasion violations, and shipping violations. For more information on various types of trade violations, visit *https://www.cbp.gov/trade/e-allegations.*

**Intellectual Property Rights Search**

CBP works closely with rights holders in making IPR enforcement determinations. A public database of both active and inactive recordations is available using a search engine called the Intellectual Property Rights Search (IPRS) at *http://iprs.cbp.gov/.*



**Amount of Active Recordations**

| Fiscal Year (FY) | |
|---|---|
| FY 2021 | 20,756 |
| FY 2020 | 18,757 |
| FY 2019 | 18,745 |
| FY 2018 | 17,641 |

| e-Allegations by Fiscal Year (FY) | | |
|---|---|---|
| **Fiscal Year (FY)** | **Amount of IPR (Counterfeit Trademark & Piratical Copyright) e-Allegations** | **Total Number of e-Allegations received that FY** |
| **2018** | 324 | 1,162 |
| **2019** | 264 | 1,252 |
| **2020** | 360 | 1,290 |
| **2021** | 407 | 1,743 |

# DON'T TOY AROUND WITH COUNTERFEITS.

## COUNTEREITS ARE UNSAFE. ONLY TRUST REPUTABLE SOURCES.

The risks of shopping online aren't always obvious. Be informed about the dangers of counterfeit goods.



**Fake Goods. Real Dangers.**

www.CBP.gov/fakegoodsrealdangers



U.S. Customs and Border Protection

FY 202

**18**

# Exclusion Orders and Outreach

**Exclusion Orders**

CBP enforces exclusion orders issued by the International Trade Commission (ITC). Most ITC exclusion orders are patent based. The ITC issues both limited and general exclusion orders. Limited exclusion orders apply only to infringing articles of named respondents. General exclusion orders bar the entry of infringing articles by all.

Exclusion orders prohibit the entry of all covered articles, even if they were not specifically accused and found to infringe by the ITC. Once excluded, subsequent importations of the same articles by the same importer are subject to seizure.

» Exclusion Orders – for FY 2021:
  - Seizures correctly citing 19 USC 1337(i): 81 cases
  - Seizure Est. MSRP: $1,930,683.
  - Total Active Exclusion Orders: "At the end of FY 2021, CBP was administering 128 active exclusion orders issued by the U.S. International Trade Commission following investigations of unfair import practices in the importation of articles into the United Sates in violation of 19 U.S.C. § 1337."

**Public Awareness Campaign**

In FY 2021, CBP continued the *Truth Behind Counterfeits* IPR Public Awareness Campaign intended to educate the public of many harms associated with the purchase of counterfeit goods. The goal of the campaign is to increase consumer conscientiousness by making people aware that buying counterfeits is not a victimless crime and to encourage them to shop from legitimate and trustworthy sources. Due to COVID-19, CBP pivoted its consumer education campaign to leverage existing digital platforms and utilize relationships with trade associations to bring awareness to the dangers of counterfeit goods. This included the use of traditional media avenues as well as CBP's social media presence (Twitter, Facebook, and Instagram) and updating CBP's IPR website (*https://www.cbp.gov/trade/priority-issues/ipr*) and the *Truth Behind Counterfeits* standalone webpage (*https://cbp.gov/trade/fakegoodsrealdangers*).

**Asia Pacific Economic Cooperation**

In February 2021, at the Asia Pacific Economic Cooperation (APEC) Subcommittee on Customs Procedures (SCCP) meeting that was hosted virtually by New Zealand, CBP presented the results of the COVID-19 joint enforcement effort that took place from November 10 to December 10, 2020. This operation helped participating economies with the identification, interdiction, and deterrence of counterfeit COVID-19 related items and had participation from eight APEC economies (Australia, Japan, Mexico, New Zealand, Papua New Guinea, Peru, Thailand, and the United States). Following on this effort, the United States and Peru conducted a joint enforcement COVID-19 focused operation in June 2021 to assess IPR trends since the previous operation. Both the U.S. and Peru presented their results to the APEC SCCP at the virtual meeting held in August 2021.



# Outreach: CBP/U.S. Chamber of Commerce Memorandum of Understanding

On May 26, 2021, CBP entered a novel memorandum of understanding (MOU) with the U.S. Chamber of Commerce (Chamber) that outlines general terms of connecting resources and sharing information to stop the flow of counterfeit goods.  This memorandum of understanding establishes a first-of-its-kind framework for public-private collaboration on combatting counterfeit and pirated goods. The MOU consists of four pillars:

1. **Outreach:**  CBP and the Chamber agreed to support outreach efforts related to bringing awareness to the public about the dangers of counterfeit goods. During the holiday season of 2021, CBP and the Chamber participated in a joint holiday campaign, the Shop Smart Campaign, which included a media blitz that reached an audience of over 83 million people.

2. **CBP IPR Statistics Data Sharing:**  CBP provides exclusive IPR seizure statistics on a quarterly basis to the Chamber.  CBP has provided all the FY2021 Quarterly IPR statistics.

3. **Training:**  CBP and the Chamber have agreed to provide bi-directional training to each of their relevant personnel/members.

4. **Data Pilot:**  CBP is conducting a data sharing pilot with three of the Chamber's member companies, with the hopes of expanding the pilot to include other companies in the future. The current pilot serves as an opportunity to establish best practices for IPR data sharing with the private sector.  It also offers CBP the ability to test the viability of data sharing with major brands to better target and seize imports of counterfeit and pirated goods and other IPR violative merchandise.

Information sharing between CBP and the U.S. Chamber of Commerce strengthens CBP's ability to defend intellectual property standards that generate American jobs, save lives, and enhance our economic prosperity The MOU enhances CBP's abilities to effectively target and intercept substandard, illegitimate goods and protect American ingenuity.



# Outreach: The Year of the Small and Medium Sized Enterprises Webinar Series



In FY 2021 CBP launched a webinar series directed to small and medium enterprises entitled 'The Year of the Small and Medium Sized Enterprises (SME)'. *https://www.cbp.gov/trade/priority-issues/ipr/cbp-year-sme*. The series of webinars focused on topics concerning how SMEs can work with CBP to help prevent imports of merchandise that infringes their IPR. During FY 2021, CBP hosted four webinars that reached 1200 members of the SME trade community. These webinars focused on

how SMEs could protect their ingenuity from infringing imports, what to do after registering your mark with CBP, and e-commerce businesses.

Due to this outreach, CBP has seen a rise in the number of recordation applications by trademark and copyright owners of small and medium sized businesses. This has reinforced that the CBP recordation program is a powerful tool for SMEs in combatting infringing importations.



FY 2021

21



# IPR and E-Commerce

E-commerce is a growing segment of the economy of the U.S. It made up 10.7% of the total retail sales in 2019 at $578.5 billion U.S. dollars (USD) and subsequently accounted for 14% of the total retail sales in 2020 amounting to $792 billion USD[13]. In 2020 alone, e-commerce sales in the U.S. grew over 40% and reached $791.8 billion USD in value[14].

During the second quarter of 2021, the U.S. retail e-commerce sales were estimated at $222.5 billion, an increase of 3.3 percent from the first quarter of 2021[15]. The second quarter 2021 e-commerce estimate increased at 9.1 percent from the second quarter of 2020. E-commerce sales in the second quarter of 2021 accounted for 13.3 percent of total sales[16]. In FY 2021, CBP processed 213 million express shipments and 94 million international mail shipments.

Such growing trends comes with many challenges. While e-commerce shipments pose the same health, safety, and economic security risks as containerized shipments, due to the complex and dynamic nature of the industry, CBP lacks full visibility into the e-commerce supply chain. The overwhelming volume of small packages also makes CBP's ability to identify and interdict high risk packages difficult. Further, vague and inaccurate electronic data provided by certain trade entities poses significant challenge when targeting shipments.



Growth of Small Shipments
(Totals are displayed in millions)

In response to the increasing challenges in the e-commerce environment, CBP has been focusing its effort to improve trade risk management by working closely with the trade community. Going into its second year, CBP continues to operate two test pilot programs, the Section 321 Data Pilot and the Entry Type 86 Test and is now looking to formalize the success of these two pilot programs.

**Section 321 Data Pilot**
Initiated in 2019, the Section 321 Data Pilot is a voluntary collaboration with online marketplaces, carriers, technology firms, and logistics providers to secure e-commerce supply chains and protect American consumers. CBP is conducting this test for two reasons: the first is to determine the feasibility of requiring advance data from different types of parties; and the second is to determine the feasibility of requiring additional data that is generally not required under current regulations to effectively identify and target high-risk shipments in the e-commerce environment. To further evaluate the Section 321 Data Pilot program and the risks associated with Section 321 *de minimis* shipments, in August 2021, CBP announced in the *Federal Register* its plan to extend the current test program through August 2023.

Since the establishment of the program in 2019, CBP has experienced significant operational benefits. Specifically, along with the administrative ruling issued in July 2020[17], this pilot program better positions CBP to identify duty evasions and other abuses consistent with current statutory authorities and helps create a more predictable enforcement environment for trade. This ruling also provides CBP with important foreign seller information with which to target and interdict counterfeit products, consumer safety violations, and other threats before they enter the U.S. For the owner or purchaser to qualify as the "person" under Section 321, importers are required to provide the first and last name of the owner or purchaser, or the name of the business.

**Entry Type 86 Test**
In September 2019, CBP also launched a voluntary test of a Section 321 *de minimis* commercial entry process

13 "2019 E-Stats Report: Measuring the Electronic Economy," U.S. Census Bureau, August 5, 2021, *https://www.census.gov/ newsroom/press-releases/2021/e-estats-report-electronic-economy.html*.
14 "Monthly Retail Trade," U.S. Census Bureau, *https://www.census.gov/retail/index.html*.
15 "Quarterly Retail E-Commerce Sales – 2nd Quarter 2021," U.S. Census Bureau, August 19, 2021, *https://www.census.gov/retail/ mrts/www/data/pdf/ec_current.pdf*.
16 *Id.*

# IPR and E-Commerce

through the creation of the new Entry Type 86.  The Entry Type 86 Test allows customs brokers and self-filers to electronically submit *de minimis* entries through the Automated Broker Interface, including those subjects to partner government agency (PGA) data requirements for clearance.  This new entry type aimed to improve import safety and security by providing greater visibility into low value shipments for both CBP and PGAs while ensuring regulatory requirements are met.  Creation of the new informal entry type 86 allows for customs brokers and self-filers to electronically submit entries with a limited data set that is exempt from duty, taxes and fees.



***Documented Benefits of Section 321 Data Pilot and Entry Type 86 Test***
In FY 2021, CBP received 524 million filings on *de minimis* shipments (182 million Section 321 Data Pilot; 342 million Entry Type 86).  In the fourth quarter of fiscal year 2020, CBP received Section 321 Data Pilot data on nearly 25% of all non-mail *de minimis* shipments.  Similarly, Entry Type 86 filings accounted for almost 50% of all non-mail *de minimis* shipments.  The two pilot programs have also shown significant operational benefits when pilot participants provided seller information, product pictures, and other transactional details.  First, the programs led to more predictable and consistent enforcement environment for low-risk shipments and trusted trade partners.  Second, obtaining advance data elements significantly reduced CBP workload with same-day clearance compared to the previous six- to eight-day wait times.  Further, advance information led to fewer CBP holds and improved overall security, including mitigating risks associated with the importation

of potential counterfeit test kits, medical devices, and personal protective equipment related to COVID-19.

Pilot participants also experienced fewer holds.  One platform experienced 97% fewer holds from when they first began transmitting data.  Another platform also experienced 90% fewer holds.  In addition to such operational benefits, feedback received in a CBP survey revealed that pilot participants saw an estimated $2 billion USD in time and cost savings associated with the Entry Type 86 Test.

***Informed Compliance Efforts***
While administering the two pilot programs, CBP has made significant efforts to engage with the trade community and to inform stakeholders of the Section 321 administrative ruling and its implications.  In addition to engaging with the ETF, CBP's E-commerce Branch and Office of Trade Relations actively connect with the trade community in various fora.  For example, CBP holds quarterly public meeting with the Advisory Committee on Commercial Operations (COAC), a group of private sector stakeholders selected to advise the Secretaries of the Department of Treasury and the Department of Homeland Security on the commercial operations of CBP (recordings of part meetings: *https://www.cbp.gov/trade/stakeholder-engagement/coac/coac-public-meetings*.  To reach wider foreign sellers and shippers and inform them of the administrative ruling issued in July 2020, the branch also translated and issued the ruling in Chinese (*https://www.cbp.gov/sites/default/files/assets/documents/2021-Apr/1%20Administrative%20Ruling%20One-Pager%20Mandarin%20Translation.pdf*).  Lastly, CBP participated in numerous webinars and online trainings to inform the public the latest regulations and available resources (*https://www.cbp.gov/trade/stakeholder-engagement*).

CBP understands the importance of working closely with the trade community to achieve its objectives, especially when implementing new administrative rulings.  CBP has been engaged with the trade community throughout this dynamic process and will continue to work with not only the traditional players, but also foreign stakeholders who will be affected by the Section 321 administrative ruling.

---

17  CBP issued an administrative ruling that clarified whether importations made by a nonresident importer in one day and sent to a U.S. fulfillment facility or warehouse may qualify for informal duty-free entry under 19 U.S.C. § 1321(a)(2)(c).  The administrative ruling when into effect on July 28, 2020 and was published in the Customs Rulings Online Search System (CROSS) on July 31, 2020.  See *https://rulings.cbp.gov/search?term=H290219&collection=ALL&sortBy=RELEVANCE&pageSize=30&page=1*.

# Centers of Excellence and Expertise Spotlight

CBP has 10 Centers of Excellence and Expertise (Centers) to focus CBP's trade expertise on industry-specific issues through account-based processing on a national scale. The Centers, managed from strategic locations around the country, have national authority to make trade decisions at all ports of entry in an effort to meet the goals of strengthening America's economic competitiveness, enhancing industry knowledge and expertise, developing innovative trade processing procedures, applying strategic and impactful trade enforcement actions, and leveraging available trade intelligence. The Centers are the operational entity of CBP responsible for identifying, assessing and prioritizing risks within their respective industries with a focus on CBP's priority trade issues. The Centers also administer the collection of trade remedies as well as lead and carry out operations to detect and deter unlawful trade activities.

To learn more about the Centers, visit *https://www.cbp.gov/trade/centers-excellence-and-expertise-information*.





# Mode of Transportation and Top Product Commodities



**SEIZURES BY MODE OF TRANSPORTATION**

7,293 MAIL

2,274 CARGO

16,926 EXPRESS

ALL OTHERS 622

**TOP PRODUCTS SEIZED BY NUMBER OF SEIZURE LINES**

30% WEARING APPAREL/ ACCESSORIES

28% HANDBAGS/ WALLETS

13% FOOTWEAR

12% WATCHES/ JEWELRY

5% CONSUMER ELECTRONICS

4% CONSUMER PRODUCTS

3% PHARMACEUTICAL/ PERSONAL CARE

1% AUTOMOBILE/ AEROSPACE

1% LABEL TAGS

ALL OTHER COMMODITIES 4%

# Seizure World Map



**FY 2021 TOTALS**
**NUMBER OF SEIZURE LINES: 102,490**
**MSRP: $3.3 Billion**

# Seizure World Map



**ALL OTHER COUNTRIES 27%**

Case: 1:24-cv-01749 Document #: 1-2 Filed: 03/01/24 Page 31 of 45 PageID #:53

# Number of Seizures

## Number of Seizures Lines by Fiscal Year 2021

## Number of Seizures Lines by Fiscal Year 2020



# Number of Seizures

| Number of Seizure Lines by Product – FY 2021 | | |
|---|---|---|
| **Products** | **Seizure Lines** | **Percentage** |
| Wearing Apparel/Accessories | 30,681 | 30% |
| Handbags/Wallets | 28,331 | 28% |
| Footwear | 13,355 | 13% |
| Watches/Jewelry | 12,313 | 12% |
| Consumer Electronics | 5,380 | 5% |
| Consumer Products | 3,721 | 4% |
| Pharmaceuticals/Personal Care | 3,155 | 3% |
| Automotive/Aerospace | 1,303 | 1% |
| Labels/Tags | 641 | 1% |
| All Other Commodities | 3,610 | 4% |
| **Number of Seizure Lines** | **102,490** | **100%** |

| Number of Seizure Lines by Product – FY 2020 | | |
|---|---|---|
| **Products** | **Seizure Lines** | **% of Total** |
| Wearing Apparel/Accessories | 20,386 | 28% |
| Handbags/Wallets | 16,554 | 23% |
| Footwear | 10,868 | 15% |
| Watches/Jewelry | 9,405 | 13% |
| Consumer Electronics | 5,534 | 8% |
| Consumer Products | 2,940 | 4% |
| Pharmaceuticals/Personal Care | 2,819 | 4% |
| Automotive/Aerospace | 968 | 1% |
| Labels/Tags | 470 | 1% |
| All Other Products | 2,413 | 3% |
| **Number of Seizure Lines** | **72,357** | **100%** |

\* In an effort to streamline DHS reporting, we are now reporting seized by seizure lines and not seizures. This will allow for greater specificity, especially for those seizures which contain more than one type of commodity. Shipments with multiple products are categorized as All Other Commodities. Because the individual percentage figures are rounded, in some cases, the sum of the rounded percentages for a given fiscal year is slightly higher or lower than 100 percent.

# Products Seized by MSRP

### MSRP By Product FY 2021



Total FY 2021 MSRP $3,330,037,350

### MSRP By Product FY 2020



Total FY 2020 MSRP $1,309,156,510

# Products Seized by MSRP

| MSRP By Product – FY 2021 | | |
|---|---|---|
| **Products** | **MSRP** | **Percentage** |
| Watches/Jewelry | $1,186,747,146 | 36% |
| Handbags/Wallets | $972,495,390 | 29% |
| Wearing Apparel/Accessories | $487,370,983 | 15% |
| Pharmaceuticals/Personal Care | $185,043,493 | 6% |
| Consumer Electronics | $171,010,749 | 5% |
| Footwear | $96,690,708 | 3% |
| Consumer Products | $72,075,495 | 2% |
| Toys | $25,420,514 | 1% |
| Computers/Accessories | $24,553,282 | 1% |
| All Other Products | $108,629,590 | 3% |
| **Grand Total** | **$3,330,037,350** | **100%** |
| **Number of Seizure Lines** | **102,490** | |

| MSRP By Product – FY 2020 | | |
|---|---|---|
| **Products** | **MSRP** | **Percentage** |
| Watches/Jewelry | $435,249,467 | 33% |
| Handbags/Wallets | $282,702,448 | 22% |
| Consumer Electronics | $173,829,670 | 13% |
| Wearing Apparel/Accessories | $157,226,661 | 12% |
| Footwear | $63,146,456 | 5% |
| Pharmaceuticals/Personal Care | $56,190,152 | 4% |
| Consumer Products | $49,695,611 | 4% |
| Labels/Tags | $19,823,791 | 2% |
| Automotive/Aerospace | $11,063,561 | 1% |
| All Other Products | $60,228,693 | 5% |
| **Grand Total** | **$1,309,156,510** | **100%** |
| **Number of Seizure Lines** | **72,537** | |

\* In an effort to streamline DHS reporting, we are now reporting seized by seizure lines and not seizures. This will allow for greater specificity, especially for those seizures which contain more than one type of commodity. Shipments with multiple products are categorized as All Other Commodities. Because the individual percentage figures are rounded, in some cases, the sum of the rounded percentages for a given fiscal year is slightly higher or lower than 100 percent.

# Total Seizure Lines and MSRP Seized by Economy

**Seizure Lines By Economy FY 2021**



- China
- Hong Kong
- Turkey
- Philippines
- Colombia
- All Other Countries

Number of Seizure Lines: 102,490

**Seizure Lines By Economy FY 2020**



- China
- Hong Kong
- Turkey
- Vietnam
- Thailand
- All Other Countries

Number of Seizure Lines: 72,357

# Total Seizure Lines and MSRP Seized by Economy

| Seizures Lines and Related MSRP by Economy – FY 2021 | | | |
|---|---|---|---|
| **Trading Partner** | **Seizure Lines** | **% of Total** | **MSRP** |
| China | 33,323 | 33% | $1,888,298,761 |
| Hong Kong | 18,466 | 18% | $613,462,655 |
| Turkey | 10,781 | 11% | $60,347,048 |
| Philippines | 6,416 | 6% | $45,692,010 |
| Colombia | 5,912 | 6% | $23,980,798 |
| All Other Countries | 27,592 | 27% | $698,256,079 |
| **Total** | **102,490** | **100%** | **$3,330,037,350** |

| Seizures Lines and Related MSRP by Economy – FY 2020 | | | |
|---|---|---|---|
| **Trading Partner** | **Seizure Lines** | **% of Total** | **MSRP** |
| China | 26,985 | 37% | $660,767,476 |
| Hong Kong | 23,493 | 32% | $428,961,694 |
| Turkey | 6,831 | 9% | $31,237,035 |
| Vietnam | 2,123 | 3% | $25,803,755 |
| Thailand | 1,445 | 2% | $12,601,807 |
| All Other Countries | 11,480 | 16% | $149,784,743 |
| **Grand Total** | **72,357** | **100%** | **$1,309,156,510** |

\* The aggregate seizure data reflect the reported country of origin, not necessarily where the seized goods were produced. Because the individual percentage figures are rounded, in some cases, the sum of the rounded percentages for a given fiscal year is slightly higher or lower than 100 percent.

# Seizures by Mode of Transportation

## Modes of Transportation by MSRP (in millions)



## Modes of Transportation by Seizures



# Seizures by Mode of Transportation

| Modes of Transport Estimated MSRP (in Millions) | | | |
|---|---|---|---|
| **FY 2021** | **FY 2020** | **FY 2019** | **FY 2018** |
| Express | $1,036.1 | $589.1 | $553.5 | $549.2 |
| Mail | $231.5 | $98.1 | $175.6 | $197.3 |
| Cargo | $1,575.7 | $463.4 | $488.2 | $447.9 |
| Other | $486.7 | $158.5 | $337.9 | $205.4 |
| *TOTAL* | $3,330.0 | $1,309.1 | $1,555.2 | $1,399.8 |

| Modes of Transport Seizures | | | |
|---|---|---|---|
| **FY 2021** | **FY 2020** | **FY 2019** | **FY 2018** |
| Express | 16,926 | 17,001 | 15,811 | 21,632 |
| Mail | 7,293 | 6,886 | 8,982 | 9,643 |
| Cargo | 2,274 | 1,993 | 1,903 | 1,673 |
| Other | 622 | 623 | 903 | 862 |
| *TOTAL* | 27,115 | 26,503 | 27,599 | 33,810 |

# Health, Safety, and Security (HSS) by Product

### Health, Safety, and Security (HSS) by Commodity FY 2021



### Health, Safety, and Security (HSS) by Commodity FY 2020



# Health, Safety, and Security (HSS) by Product

| Health, Safety, and Security (HSS) by Commodity – FY 2021 | | |
|---|---|---|
| **Health, Safety, and Security** | **Seizure Lines** | **% of Total** |
| Pharmaceuticals/Personal Care | 3,041 | 46.6% |
| Consumer Electronics | 1,165 | 17.8% |
| Automotive/Aerospace | 1,002 | 15.3% |
| Wearing Apparel/Accessories | 457 | 7.0% |
| Cigarettes | 309 | 4.7% |
| Consumer Products | 170 | 2.6% |
| Computers/Accessories | 84 | 1.3% |
| Sporting Goods | 38 | 0.6% |
| Food | 19 | 0.3% |
| All Other Commodities | 247 | 3.8% |
| **Number of Seizure Lines** | **6,532** | **100%** |

| Health, Safety, and Security (HSS) by Commodity – FY 2020 | | |
|---|---|---|
| **Health, Safety, and Security** | **Seizure Lines** | **% of Total** |
| Pharmaceuticals/Personal Care | 2,706 | 47.6% |
| Consumer Electronics | 1,630 | 28.7% |
| Automotive/Aerospace | 511 | 9.0% |
| Consumer Products | 165 | 2.9% |
| Computers/Accessories | 139 | 2.4% |
| Cigarettes | 119 | 2.1% |
| Sporting Goods | 81 | 1.4% |
| Wearing Apparel/Accessories | 30 | 0.5% |
| Food | 21 | 0.4% |
| All Other Commodities | 277 | 4.9% |
| **Number of Seizure Lines** | **5,679** | **100%** |

\* In an effort to streamline DHS reporting, we are now reporting seized by seizure lines and not seizures. This will allow for greater specificity, especially for those seizures which contain more than one type of commodity. Shipments with multiple products are categorized as All Other Commodities. Because the individual percentage figures are rounded, in some cases, the sum of the rounded percentages for a given fiscal year is slightly higher or lower than 100 percent.

# MSRP by Centers of Excellence and Expertise

| MSRP by Center of Excelle | | | | |
|---|---|---|---|---|
| **Fiscal Year** | **FY 2021** | | **FY 2020** | |
| **Center Name** | **MSRP** | **% of Total MSRP** | **MSRP** | **%** |
| Consumer Products and Mass Merchandising | $2,358,989,573 | 70.84% | $841,588,271 | |
| Apparel, Footwear and Textiles | $588,394,332 | 17.67% | $231,915,396 | |
| Electronics | $196,173,287 | 5.89% | $170,643,120 | |
| Pharmaceuticals, Health and Chemicals | $138,605,159 | 4.16% | $21,024,365 | |
| Automotive and Aerospace | $21,168,082 | 0.64% | $10,857,996 | |
| Agriculture and Prepared Products | $9,284,046 | 0.28% | $893,941 | |
| Industrial and Manufacturing Materials | $5,514,953 | 0.17% | $3,260,622 | |
| Machinery | $10,741,371 | 0.32% | $22,860,881 | |
| Base Metals | $1,166,547 | 0.04% | $6,111,920 | |
| **Total** | **$3,330,037,350** | **100%** | **$1,309,156,510** | |

# MSRP by Centers of Excellence and Expertise

| ence and Expertise (CEEs) | | FY 2019 | | FY 2018 | |
|---|---|---|---|---|---|
| % of Total MSRP | MSRP | % of Total MSRP | MSRP | % of Total MSRP |
| 64.28% | $1,000,628,016 | 64.34% | $1,037,183,326 | 74.09% |
| 17.71% | $383,694,303 | 24.67% | $192,996,007 | 13.79% |
| 13.03% | $117,028,274 | 7.52% | $121,609,130 | 8.69% |
| 1.61% | $9,234,202 | 0.59% | $8,896,989 | 0.64% |
| 0.83% | $9,868,483 | 0.63% | $14,638,119 | 1.05% |
| 0.07% | $3,882,013 | 0.25% | $4,578,951 | 0.33% |
| 0.25% | $1,225,896 | 0.08% | $951,393 | 0.07% |
| 1.75% | $27,810,170 | 1.79% | $11,475,793 | 0.82% |
| 0.47% | $1,897,700 | 0.12% | $7,544,135 | 0.54% |
| **100%** | **$1,555,269,057** | **100%** | **$1,399,873,842** | **100%** |

# CBP IPR Points of Contact

**Questions? Contact the IPR Help Desk For As**
Monday through Friday to answer questions on
via email at _IPRHELPDESK@cbp.dhs.gov_.

**Regulations, Rulings, and Recordation** – For qu
contact Regulations and Rulings (RR) at _hqiprbra_
the e-Recordation program, contact _iprquestion_
articles potentially subject to an ITC exclusion or
_Rulings@cbp.dhs.gov_.

**Guidance on CBP IPR Policy and Programs** - T
coordinates with rights holders, members of the
agencies, and foreign governments in developing
policy and programs. To contact the IPR Division

**e-Allegations** - If you are aware of or suspect a
please report the trade violation using CBP's e-A
System at _https://eallegations.cbp.gov/s/_. Trade
1-800-BE-ALERT.

**National Intellectual Property Rights Coordin**
Intellectual Property Rights, including counterfei
Coordination Center at _https://www.iprcenter.g_

# CBP IPR Points of Contact

**ssistance** - CBP's IPR Help Desk is staffed
IPR enforcement. Contact the IPR Help Desk

uestions about CBP's IP enforcement regime,
_nch@cbp.dhs.gov_. For information concerning
_ns@cbp.dhs.gov_. Ruling requests regarding
rder may be submitted to _EOEBranch.ITC337._

he IPR and E-Commerce Division (IPR Division)
trade community, CBP staff, other Federal
g and implementing the Agency's IPR strategy,
, email _iprhelpdesk@cbp.dhs.gov_.

company or individual is committing IPR crime,
Allegations Online Trade Violation Reporting
violations can also be reported by calling

**ation Center** - To Report Violations of
ting and piracy, contact the National IPR
_ov/referral/_ or telephone 1-866-IPR-2060.



U.S. Customs and
Border Protection

CBP Publication No. 2018-0922